

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00058-CV

_____

IN THE INTEREST OF A.W., A CHILD

On Appeal from the 325th District Court
Tarrant County, Texas
Trial Court No. 325-679062-20

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

When Amanda[1] tested positive at birth for drugs in 2017, Appellant Mother had already been through several child-protection cases with the Department of Family and Protective Services (DFPS), and her estranged husband Bradley, who was not Amanda's father, had custody of Mother's four older children. Two years later, while trying to apprehend Appellant Father, a police officer or bounty hunter shot at the car in which Amanda, Mother, and Father were riding. A bullet hit Father, and the family fled to Oklahoma, where Father was apprehended. Amanda tested positive for methamphetamine and was removed from Mother on March 7, 2019.

Father was incarcerated when Amanda was removed, and on July 8, 2019, he pleaded guilty to possession of less than one gram of methamphetamine in exchange for a 15-year sentence. He was incarcerated for the duration of the termination-of-parental-rights case. Father's parental rights to Amanda were terminated under Subsections (D) and (E) (the endangerment subsections), Subsection (Q) (the subsection under which a parent knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement and inability to care for the child for not less than two years from the date of filing the petition), and Subsection (2) (the best interest subsection) of Family Code Section 161.001(b). In three points, Father

---

[1]We use pseudonyms for the names of the child and her family to preserve the child's privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

complains that there was legally and factually insufficient evidence to support the trial court's endangerment findings or its finding that Father was unable to care for Amanda for not less than two years from the date DFPS filed its petition to terminate his parental rights due to his imprisonment.

During the case, Mother, pregnant with her sixth child, who had a different father from Amanda, went into inpatient drug treatment and completed some of her service plan but ultimately relapsed. Her parental rights to Amanda were terminated under Subsections (D) and (E), (O) (the failure-to-comply-with-court-order subsection), (P) (the endangerment-by-substance-abuse subsection), (R) (the child-born-addicted-to-drugs subsection), and Subsection (2) of Family Code Section 161.001(b). In a single issue, she argues that the evidence is factually insufficient to show that termination of her parental rights to Amanda was in Amanda's best interest. We correct the judgment[2] and affirm it as modified.

## II. Background

Father opted not to testify during the trial. DFPS called Mother and the caseworker during its case in chief. Bert, Mother's paramour and the father of her

---

[2]The trial court could not terminate Mother's parental rights under Subsection (R) because that ground was not pleaded in DFPS's live petition. *See In re J.R.S.*, 232 S.W.3d 278, 285 (Tex. App.—Fort Worth 2007, no pet.) (stating that the party seeking termination must have pleaded the conduct ground that the factfinder found). However, Mother does not challenge the sufficiency of the evidence to support the trial court's findings on the remaining grounds under Section 161.001(b)(1), and the record contains sufficient evidence to support them.

new baby, Lara, testified during Mother's case in chief. Jesse Caloway, a private investigator, testified during the guardian ad litem's case in chief. We set out their testimony below in the order in which it was given.

## A. Mother's Testimony

Mother was born in 1982 and started using methamphetamine when she was 19 years old. Her husband Bradley introduced her to the drug. She was almost 40 years old at the time of the March 2021 termination trial and had been through inpatient drug treatment three times—twice during the instant case—and outpatient drug treatment four times

Amanda, who was born in October 2017, is one of Mother's six children, none of whom were in her possession at the time of the termination trial. Daisy, an 18-year-old girl; Jeffrey, a 15-year-old boy; and nine-year-old twin boys David and Richard were Mother's children with Bradley, who has custody of them. Mother is still married to Bradley, and she has standard visitation with her four oldest children.

Amanda's biological father is Father. Mother became pregnant during the pendency of Amanda's case and gave birth to an infant girl, Lara, whose biological father is Bert, who had a history of methamphetamine use. Lara was removed from Mother in February 2021 when Mother tested positive for drugs.

Mother agreed that she had an extensive history with DFPS related to her methamphetamine addiction but denied that there had been at least ten separate cases

involving her children,[3] stating: "I know there was one involving my son at birth, my twins at birth, [Amanda] at birth, then [Amanda] again, then this one with [Lara]." Mother said that Amanda, Jeffrey, and David had been born positive for methamphetamine but that David's twin Richard had not been. Although DFPS had offered services in each case, Mother had not worked the services diligently with her four older children because when her relationship with Father began, she did not have a vehicle, a home, or a job.

When Amanda tested positive for drugs at birth, Mother began working the services and underwent outpatient drug treatment; she had been allowed to take Amanda home from the hospital, and that case ended in 2018. Amanda was a year-and-a-half old in March 2019, when the instant case began, and she turned three while in foster care.[4]

Mother agreed that in March 2019, she had been in a relationship with Father that had involved drug use by both of them and "[a] lot of domestic violence."

---

[3]Mother's caseworker testified that Mother had been given the opportunity to work services with DFPS at least six times; the instant case involved the fifth removal of a child from Mother, and she was given at least two different opportunities to work services during the instant case. Mother's caseworker said that Mother's DFPS history began around 2003 and that all of it involved methamphetamine use.

[4]During the course of the case, Mother moved to extend the case's dismissal date so that she could finish her service plan. *See* Tex. Fam. Code Ann. § 263.401. DFPS subsequently requested an extension for a monitored return, *see id.* § 263.403, and then to retain the case on the docket pursuant to emergency orders issued by the Supreme Court of Texas in response to the Covid-19 pandemic.

Mother said that she had always tried to keep Amanda in a separate room when she and Father were using drugs but "she was still several times in [the San Angelo[5]] home where [Mother and Father] were using drugs." According to Mother, during their relationship, Father had been involved in "[a] lot of criminal activity," and she did not believe that he was a safe person. She agreed that it had been an "[e]xtremely bad choice" to remain with Father at that time, given his criminal history.

In March 2019, a police officer,[6] who had a warrant for Father's arrest, shot through the middle of the windshield of the car in which Mother, Father, and Amanda were sitting—Father had been in the driver's seat, Mother had been in the front passenger's seat, and Amanda had been directly behind the driver's seat in a car seat.[7]

According to Mother:

We were out of town in Fort Worth, downtown, and we were meeting my brother to have dinner, and we were -- [Father] was driving the vehicle. I was in the passenger seat, and [Amanda] was in her car seat behind him. And we stopped in the parking lot to talk to my brother.

---

[5]At the time of the termination trial, Mother was living in the same home, where she provided caregiver services to a hospice patient. Mother said that the house was hers, courtesy of the patient, and that the patient had not been aware that she and Father had been using methamphetamine.

[6]Mother said that she clearly remembered seeing a badge around the neck of the man standing in front of the car with the gun but said that the man had not been dressed like a police officer.

[7]Mother acknowledged that the bullet would have hit Amanda if Father had been just a few inches over.

> [Father] rolled his window halfway down to talk -- to correspond with my brother, and out of nowhere two men, one jumped in front of the car, one jumped on the driver's side door of the car, one had a gun pointed at the front of us in our face, and the other one was wrestling with [Father] through the window on the driver's side.

Mother said that she had known that Father had a warrant out for his arrest and that the men with guns turned out to be bounty hunters or police—she was not sure which. Mother stated that when the glass flew past her face, she thought Amanda might have been hit by a bullet. According to Mother, before the gun was fired, she had just wanted to grab Amanda, get out of the car, and run away, but there was no time because everything "was just so fast and confusing." Mother denied having been under the influence of methamphetamine at the time, although she agreed that she had been actively using methamphetamine in March 2019.

After the gun's discharge, Father hit the gas and drove the car into the shooter,[8] and he did not stop until the pursuit through downtown Fort Worth ended. Mother said that they were chased, "flying through red lights, sliding around corners." She stated, "It[] was very dangerous and extremely scary," and she had not known "if the car was going to get flipped over, if [they] were going to hit head on traffic." After successfully evading pursuit, Father parked by a gas station dumpster, and Mother jumped out, pulled Amanda from her car seat as quickly as she could, and checked Amanda head-to-toe for injuries.

---

[8]The caseworker testified that charges were filed as a result of that incident but were later no-billed.

Mother said that Father told her, "Hurry up and get up in the driver's seat, you need to drive us out of here." Mother said that she wished she had thought to take Amanda into the gas station instead and to take Father to a hospital in Fort Worth but her choices that day were "the wrong ones." Instead, she put Amanda back into the car seat and got behind the wheel. Although she begged Father to go to the hospital, he "adamantly refused to do that." Father directed her to drive to one of his drug-related friends—someone who sold drugs to Father and used drugs with Father—because he wanted to get high on the way to Oklahoma. Father and his friend rode together in the back seat and smoked methamphetamine all the way to Oklahoma.

Mother said that in the first Oklahoma town they reached, she rented a motel room, gave Father the keys to the car, and told him that she did not care what he did from that point on. Father, who had been shot in the upper right chest, went with his friend to the hospital. They then returned to the motel and stole Mother's money, "every penny that [she] had to [her] name." Mother, who had fed and bathed Amanda and herself and then gone to bed, slept "until the police came knocking on [her] door the next morning" to tell her that they were impounding her car. The Oklahoma police arranged for Mother and Amanda to be returned to Fort Worth, and upon their return, 18-month-old Amanda was removed from Mother. Amanda was taken to Cook Children's Medical Center for a hair-strand drug test and tested positive for methamphetamine.

Amanda was temporarily placed into foster care and then with Father's sister. Father's sister subsequently chose not to be Amanda's long-term placement because of concerns for the safety of her family and Amanda from Father. When asked about those concerns, Mother said that she and Father's sister "came to agree on the same worries and concerns and fears of [Father]." Mother said that she had concerns for her own safety when Father was released from prison. Amanda returned to foster care.

Mother went to inpatient drug treatment in June 2019 and again in February 2020. She met Bert at the end of July 2019, after her first inpatient treatment, and he moved in with her about a month later. Mother and Bert announced their engagement in December 2020, but they subsequently postponed it until she could get divorced from Bradley.

Lara was born in June 2020. In July or August 2020, Mother had been very close to receiving a monitored return of Amanda.[9] Mother stated that Bert had lived at a different address since August 12, 2020, two weeks after the court asked her to have him move out[10] and ordered that Bert was not allowed to be around Amanda

---

[9]Mother's caseworker testified that the monitored return failed because of Mother's "inability to understand the concerns to be protective from [Bert]."

[10]Mother stated that because of the Covid-19 pandemic, finding housing in the area had been difficult. "[I]t took two weeks before we could get him into his own place."

during Mother's unsupervised visits. Bert had refused to take any drug tests in Amanda's case or in Lara's case.

Mother's first unsupervised weekend visit in her home with Amanda took place on September 12, 2020. During her first (and only) unsupervised weekend visit with Amanda, Mother asked Bert to go with them to the park to help her with Lara so that she could play with Amanda on the playground. Mother acknowledged, "It was an extremely bad choice that I made. I regret making that choice. I realize that the park was not that important for us to -- you know, to do, and I extremely regret that choice." Future unsupervised weekend visits were cancelled because Mother had failed to follow the rules put into place for Amanda's safety. Mother said between August 12, when Bert moved out, and December, when she used drugs with him, Bert had stayed over at her home two or three days a week, sometimes overnight. When the guardian ad litem asked Mother, "Isn't it true that no one really knew that [Bert] was living in your home until I came to visit your home and was informed that he was living there?" Mother replied, "[T]hat's probably accurate."

The guardian ad litem then asked Mother whether she was aware that a private investigator had been conducting surveillance of her home at the end of September and early October 2020. Mother acknowledged that she had become aware of this and that the recorded video had been provided to her attorney. She nonetheless denied that Bert had been living in her home during that time. Twenty-nine surveillance clips, ranging from just over a minute to almost 15 minutes, were

admitted into evidence. Taken between Wednesday, September 30, 2020, at 5:42 p.m. and Sunday, October 4, 2020, at 4:46 p.m., the clips illustrate Bert's constant presence around Mother's home.

When questioned about her relationship with Bert, Mother said that they were still in a romantic relationship and denied having told her caseworker that she had no plans to live separately from Bert:

> Q. I forgot to ask, [Mother]. You have already talked about your choice to remain with [Father], and you said that was a bad choice. [Bert] also has [a] history of methamphetamine use. You are very vulnerable and have a history of meth use; is that right?
>
> A. Yes.
>
> Q. Do you think it's a bad choice to remain with [Bert] considering that you were both former meth users and you had your most recent relapse in December?
>
> A. No, ma'am, I don't think that it is a bad choice to remain in a relationship with [Bert].

But Mother admitted that her last drug use had been in December 2020 and that Bert had been involved in that relapse. Mother explained that she had found methamphetamine in Bert's toolbox when he asked her to bring him some tools, so she called her oldest daughter to watch Lara for a few hours. Mother said that her intent had been to confront Bert about why he had the drugs, but instead, they had used them. Mother said, "That's part of the disease of addiction." Three or four hours after consuming the drugs, Mother went to pick Lara up. DFPS removed Lara

11

from her because of the relapse. Yet Mother said that she did not feel like Amanda or Lara needed to be protected from Bert.

Mother said that she had not been aware of Bert's past drug possession charge from 2014 or 2015 or that he might have been using drugs when she chose him as a partner. She learned about his criminal history when she overheard him on the phone talking about transferring his probation. She tried to break off the relationship, but "it was extremely hard to do seeing that [she] just had a child with him and being his first child."[11] Mother said that to continue her relationship with Bert, he would have to do everything DFPS told him to do in Amanda's case and in Lara's case and prove to her that he was not using drugs.

Bert did not volunteer to participate in Amanda's case, and Mother was not sure whether he had jeopardized the monitored return. She stated, "I know that him not volunteering to cooperate in the case or to volunteering services that it -- I was severely punished for it." Mother acknowledged that her caseworker had told her that her February 2021 drug test was "slightly positive." In March 2021, she finished her second round of outpatient therapy, which she began after the drug-use relapse that caused DFPS to remove Lara from her.

---

[11]Mother testified that 38-year-old Bert was a plumber, had never been married, and had no children other than Lara. Mother said that Bert was a very good father and a very hard worker and that he no longer used drugs.

12

During cross-examination by her attorney, Mother agreed that over the course of the case, she had come to understand that the decisions she made could put Amanda in danger. Mother listed the following as steps she had taken to protect Amanda:

> I have been doing extensive counseling. I have been through extensive trauma counseling, domestic abuse counseling, drug treatment. I have made better decisions on my relationship, and I go to [Narcotics Anonymous (NA)] several days a week[]. I have a sponsor. I'm working my 12 steps. I'm in a very -- very involved in my recovery program.

Mother added that she had "completed service plan after service plan, and even in the case with [Lara]" she was almost completely done with her service plan. And Mother insisted, "I am going to work every single day of my life on my recovery to make sure that [drug use] is not something [Amanda] has to live with."

Mother testified that she had reconnected with some of her older children and saw them regularly, "[s]ometimes daily, sometimes a couple of times a week" and described herself as "very involved in every one of their lives." She stated that when she was not working her services, she was spending time with her children. According to Mother, Amanda was bonded with her siblings, and her other children were supportive of Mother's sobriety and counted on her to remain sober. Mother said that she had learned in therapy that she was very codependent.

Regarding employment, Mother provided live-in assistance to James, an elderly man who suffered from terminal leukemia, and she worked odd jobs, "housekeeping and stuff like that." Mother stated that she would be able financially to take care of

13

Amanda because she did not pay for housing and owned her vehicle. She also earned a weekly check from James. Mother said that if Amanda was returned to her, she would probably put her in day care and get a full-time job but that her schedule was full at the time of the trial with working all of the DFPS services. Mother indicated that she would like to go back to school and get her pharmacy-tech license back.

Mother said that her bond with Amanda was one of the most important things in her life, and she traveled 400 miles round-trip for every visit with Amanda. As she pointed out, no one had criticized Mother's home or her behavior at visits as being inappropriate. Mother described her support system in San Angelo. She had an aunt and uncle who lived a few blocks away from her; her other four children lived three blocks behind her; and she had what she described as a very good co-parenting relationship with Bradley.[12] Mother's brother was also in San Angelo, as was her NA group, her sponsor, and her recovery program.

During cross-examination by Father's attorney, when asked how long the court should wait for her to continue to make bad choices for Amanda's safety before terminating Mother's parental rights, Mother declared, "I'm not exactly sure how to answer that, but every single day I make plenty of right choices and good choices.

---

[12]Mother said that there had been minor domestic abuse before she and Bradley had children and that their relationship had been rocky when they were together. She said that when he first received custody of their four children, she had felt like he had used the children against her but that their relationship had improved over time.

And, yes, I'm not perfect, and I will make mistakes for the rest of my life, so I'm not exactly sure how to answer that. But there's not a day that I'm not trying to do the very best for myself and for my children."

Mother asked the court not to terminate her parental rights, to name DFPS as Amanda's managing conservator, and to name her as possessory conservator. During cross-examination by Amanda's guardian ad litem, Mother also asked that if Amanda was returned to her, that

> some kind of protection be put into place to [e]nsure that, you know, [Father] didn't just storm through the house and run off with the baby or -- or -- you know, because, . . . he has no problem with physical violence, so that -- you know, there was nothing [she] can do to be able to stop him if he wanted to just come in [her] house take [Amanda] from [her].

Mother agreed that her relationship with Father had been unhealthy, characterized as it was by domestic abuse, criminal activity, and drug use, and she said that it had been her last toxic relationship.

Mother's long-term plan was for her, Bert, Amanda, and Lara to be a family and live together if Bert worked DFPS services and improved at getting and staying clean from drugs, "and all that."

15

## B. Caseworker's Testimony

Joan Hall, a permanency specialist with Our Community Our Kids (OCOK),[13] testified that since September 2020, when DFPS had prepared for a monitored return of Amanda to Mother, Mother had "continued to have concerning issues regarding her romantic relationships" and had relapsed into drug use. During Hall's testimony, the trial court admitted into evidence Amanda's March 2019 medical records from Cook Children's Medical Center, which showed that Amanda had tested positive for methamphetamine, and Mother's June 2020 and December 2020 drug test results, which showed that Mother had tested positive for methamphetamine. Hall agreed that Mother had a long pattern of methamphetamine use and child neglect.

Hall pointed out that Mother's continuing to test positive for drugs violated the requirements of her court-ordered service plan and that she understood that DFPS's concerns were Mother's sobriety, her ability to be protective of her children, her ability to make good decisions for herself and the children, and her ability to maintain healthy relationships. Hall believed that Mother had continued to use drugs after December 2020 because she had tested positive on February 2 and because Mother had exhibited a pattern of dishonesty throughout the case.

---

[13]OCOK is a subcontractor of the State of Texas that provides community-based care, case management, and family services for DFPS. *See* "What We Do and Why It Matters," https://ourcommunity-ourkids.org/ (last visited July 23, 2021).

Hall related that DFPS was concerned about Bert's drug history, which could make Mother vulnerable to relapse, and his failure to cooperate in the case by refusing to take drug tests. DFPS was also concerned about the dynamics of his relationship with Mother because "he might be a little controlling of [her]." Hall said that she believed Bert stayed at Mother's home most of the time and that until the day of trial, Mother had not provided Bert's address, even though Hall had asked for it several times. According to Hall, Mother's testimony that day was also the first time Mother had admitted that Bert had been with her and the children at the park. And she pointed out that Mother had admitted to Hall that her brother had stayed with her only after Hall received the surveillance report showing that he had been there.[14]

Hall acknowledged that Mother had complied with her outpatient conditions, was bonded with Amanda, and behaved appropriately at visits, but she nonetheless opined that it was in Amanda's best interest to terminate Mother's parental rights because Amanda had lived with others for two years. Hall stated that it would take an unknown amount of time for Mother to get to the point where Amanda could safely be returned to her, and the child needed permanency.

Hall testified that Father, who had been adjudicated as Amanda's father after a DNA test was conducted, was sentenced to 15 years' confinement in exchange for

---

[14]The trial court had ordered Mother to provide identifying information (name, date of birth, and social security number) for all persons staying in or residing in her home and had forbidden any frequent visitors with criminal history.

17

pleading guilty to possession of a controlled substance of less than one gram (methamphetamine), a state-jail felony enhanced to a second-degree felony, on July 8, 2019.[15] *See* Tex. Health & Safety Code Ann. § 481.115. Father accepted the plea bargain after DFPS filed the lawsuit. Hall said that she had never spoken with Father in person, by phone, or over Zoom but that they had communicated via letters and a courtesy worker had tried to see him in person and had talked to him over the phone.

Hall had created a service plan for Father, and she testified that he had completed some services that were available to him in jail, but he was unable to work on other services while incarcerated because they were not available in jail. Although Father had attempted to have contact with Amanda—he had sent letters to his brother-in-law when Amanda was in his sister's care—he had not had any contact with her. She opined that it was in Amanda's best interest to terminate Father's parental rights.

Hall stated that Amanda had originally been placed in an adoption-motivated foster home, from March 2019 to June 2019, but she was later moved to Father's sister, who initially indicated that she might be a permanent placement for Amanda. When Father's sister realized that it might not be safe for her family to keep Amanda, she changed her mind. At the end of November 2020, Amanda was returned to the original, adoption-motivated foster home, where Lara had also been placed and where

---

[15]Petitioner's Exhibit 6, a copy of Father's judgment of conviction, was admitted into evidence.

18

Amanda appeared healthy and happy. In total, Amanda had been with the foster family for about seven months. She called her foster parents "Mom" and "Dad," although she also called Mother "Mom." If the trial court terminated Mother and Father's parental rights, DFPS's plan was for Amanda to be adopted by her foster family.

Hall agreed that Father loved Amanda and had said that he was willing to do anything that would ensure Amanda's safety. However, he was serving a lengthy prison sentence, impeding his ability to show how he could care for Amanda, and Hall stated that Father would also need to show significant behavioral changes regarding his drug use, criminal activity, and violence towards others before Amanda could be returned to him. Hall agreed that Father would probably be eligible for parole in July 2021, but Amanda would be around 17 years old if Father served his full sentence. And based on Mother's testimony about her relationship with Father, Hall said that she would not feel comfortable returning Amanda to him right after he was released from prison.

Hall had received two or three letters from Father during the case. In Father's April 11, 2020 letter, which was admitted into evidence, Father expressed concern about Mother's ability to care for and protect Amanda:

> I have been informed of [Mother's] pregnancy. I also believe she manipulated [DFPS] and myself and withheld this information at court to get me to agree to her deal she worked out. I would also think that [DFPS] would not have agreed either if they would have known she was pregnant and failed multiple drug test[s] while pregnant. [Mother] told

19

me over the phone[,] which was recorded by Hood County "last week of July" that this [Bert] dude was just her drug dealer. Her brother . . . told me the same thing. I am concerned with [Amanda] being around him and I don't believe [Mother] will stay sober for either child while he's around.

[Mother] has been using a hair stripper called Oops that you buy at Walmart or at a salon to strip and clean her hair then dies [sic] her hair back and interfears [sic] with the results of a hair follicle [drug test]. She uses baking soda to pass urine test[s] or has someone else pee in a cup which she then puts in a cond[o]m and then puts that inside her private to pass the urine test. I have witnessed her do these things to pass drug test[s] for [DFPS] when [Amanda] was born.

Ms. Hall[,] I've matured a lot since being shot. The madness has to stop and I can't let [Amanda] be subjected to that life. I sincerely pray every day for [Mother's] sobriety and health. I love her with all my heart but I don't believe she will stay sober for [Amanda] and her new baby.

Whatever choice [DFPS] decides I know will be in these two [b]abies' lives will be in their best interest and I know that I did the right thing in telling the truth.

The very first hair follicle in this case she stripped and d[y]ed her hair at John and Shinly Rieser's house if you need more proof than my word.

I love [Mother] very much but she's not going to change.

P.S. I'm also concerned with [Mother's brother] returning [Amanda] to [Mother] if he is allowed to adopt [Amanda]. I may be over[re]acting the[re] but if he is approved can we make sure he knows the consequences for doing this. He really is a good man.

Hall acknowledged that during the case she had had some concerns that Mother had been altering her hair or doing other things to pass drug tests that she would not otherwise have passed. Some of the court orders specifically ordered Mother not to modify her hair to address those concerns.

## C. Bert's Testimony

After DFPS rested its case, Mother's counsel called Bert to testify. Bert testified that he and Mother had met in 2019 and that Mother became pregnant with Lara soon after they met.

Bert knew that Mother had a long pattern of addiction, but he had also seen her work on her sobriety. He agreed that Mother had relapsed during their two-year relationship. Bert stated that he understood DFPS's concerns about his being in Mother's life and his refusing to take a drug test. Bert admitted that he had accompanied Mother and Amanda to the park:

> Q. Okay. And were you -- did you understand that you were not to have any contact with [Amanda] whenever [Amanda] came home for an unsupervised visit in August of 2020?
>
> A. Yes, ma'am.
>
> Q. And were you around her on that weekend?
>
> A. I -- I was there for a park visit very briefly, other than that I was not.
>
> Q. So -- but you knew that you were told not to have contact with her, right?
>
> A. Yes, ma'am.
>
> Q. And so why didn't you just say no when she came to pick you up?
>
> A. Because I wanted to see [Amanda], and it was just -- it was a mistake. And I wish I could go back and fix it now. I should've just stayed at my place and not came around, and I am very sorry. And, like I said, I just -- I just want to be able to try to fix this.

Q. And what do you mean by fix this?

A. I'm prepared to do any services necessary, take any drug tests necessary immediately today, anything y'all need I -- I am more than willing to do.

And Bert agreed that when he visited Amanda at the park, he had voluntarily violated the court order.

Bert had moved out about two weeks after the trial court told him that if he was not willing to take a drug test, he had to move out of Mother's house before Mother could have a monitored return of Amanda. He said, "I have stated that I would be more than willing to do anything that I can now, and I am very, very sorry for not cooperating before. I just want to make this right." He continued, "I realize what I did wrong, and I -- I should have cooperated before, and I -- and I am very sorry." Bert indicated that he planned to work services in Lara's DFPS case "and do anything [he had] to and need[ed] to do for . . . [his] daughter to come home."

Bert continued to spend time at Mother's house after he moved out because he had been repairing the bathroom floors and trying to see Lara as much as he could. He said that he was not aware of any restrictions on his being around Lara at that time. Bert said that he still lived separately from Mother although he went "over to her house occasionally."

Bert said that Mother was "constantly busy" at her NA meetings on Zoom or with her counselor on Zoom, stating, "her life is full . . . of her daily tasks that she has to complete for this." He said that getting Amanda back was "the only thing on

[Mother's] mind 24 hours a day." He felt like Amanda should be returned to Mother if she could stay clean, stating, "She is a very good mother, and she's very dedicated." Bert denied that Mother had done anything to her hair or urine to alter her drug test results.

On cross-examination, DFPS's counsel asked Bert about his probation. Bert testified that he had received probation for possessing under a gram of methamphetamine and that at the end of his probation, he spent a month in county jail. But Bert said that it was his only drug charge and the only charge on his record.[16] When asked about his methamphetamine use, Bert testified that it was an isolated incident:

> Q. How long have you been using meth?
>
> A. I used it then, and I -- and I -- I haven't used except for this last time. I made a mistake. It was moments of -- it was just –
>
> Q. So you've -- the meth that you smoked in December of 2020, you smoked that with [Mother]; is that right?
>
> A. Yes, ma'am.
>
> Q. And where was the meth that you smoked?
>
> A. Where was the meth?
>
> Q. Yeah. Where was it being kept?

---

[16]During cross-examination, Bert said that he paid a fine in Ohio for discharging a firearm but was not arrested, charged with an offense, or sentenced, and that he did not currently own a gun.

23

A. It was actually found in a tool bag of mine -- well, not a tool bag of mine. It was tool bag that I got from [Mother's] house out of the shed. Whenever I moved out -- whenever I had the court order to move out I just threw tools in a tool bag –

Q. Did you buy that meth?

. . . .

A. No, ma'am.

Q. Do you know where it came from?

A. It came from a tool bag that was in the shed at [Mother's] house.[17]

Q. Is that the first time you have seen meth since your 2016 charge?

A. Yes, ma'am.

Q. And have you taken a drug test for [DFPS]?

A. I have not, but I'm more than willing to.

Q. Why weren't you going to -- why were you not willing to take a drug test in September?

A. Okay. So my whole experience and everything that I have ever heard about CPS has been nothing but horror stories, and having a new daughter I -- I was scared that I -- I just didn't want to cooperate, because I didn't want them being introduced into my life and me having problems with them, so I tried to separate myself from it.

---

[17]During cross-examination, the guardian ad litem asked Bert, "Why in the world would you decide to use meth that was found in a tool bag found in a shed?" Bert replied that he had made a mistake in a moment of weakness.

Bert also explained that because he was not a party to Amanda's case, he did not feel that he was required to comply with DFPS's request but claimed that he would have tested negative in September if he had taken the requested drug test.

During cross-examination by the guardian ad litem, in response to the question about why it took almost nine months for him to agree to cooperate in the case, Bert said that he had not understood how much it had hurt Mother not to have Amanda until his own child, Lara, was removed. Bert said, "[B]efore I went through it I -- I couldn't really understand, and I understand now, and I -- I really just wish that I could go back in time and fix it but I can't. All I can try to do is make it better."

The guardian ad litem then asked Bert why he had failed to cooperate with his own child's case, but he denied that he had failed to cooperate:

> Q. Now, back at the time of [Lara's] birth there was an investigation. Why didn't you cooperate with that investigation when it involved your own child?
>
> A. Why didn't I cooperate? I did cooperate. I -- I spoke with -- I can't remember her name, the -- I spoke with the woman on the phone all the time. She came to house, I met with her, talked with her, everything that she asked.
>
> Q. Did you take a drug test at that time?
>
> A. No.
>
> Q. Did you tell them that you were living in the home full-time?
>
> A. I -- I don't honestly recall exactly at -- at -- exactly at that time. I don't know that I was asked that.

25

Q. Isn't it true that you decided to move out because you knew that you would still be able to see [Lara] anytime you wanted?

A. Well, no one -- no, I didn't know that I couldn't. I moved out because I was told that I had to. If I didn't do the drug test I had to move out.

Bert also denied that he had often stayed overnight at Mother's house, claiming that he had been there to replace the floors, repair the bathroom, and see his daughter and if he was there at night, it was because he "just hadn't left yet." He pointed out that he saw himself in only a few of the photos that were taken when the house was under surveillance. Bert testified that he smoked cigarettes and that he smoked either in front or in back of Mother's house but not inside Mother's house. And when asked if it would surprise him to know that surveillance had picked him up coming out of Mother's house to smoke on the front porch all throughout the night each night of five days of surveillance, Bert replied, "I'd be very surprised."[18]

## D. Private Investigator's Testimony

Jesse Caloway testified that he was a private investigator hired to conduct surveillance of Mother's San Angelo home and that he conducted that surveillance, from September 30, 2020, through October 4, 2020, using an "unmanned surveillance platform," to-wit, recording video. Caloway set up the equipment, deployed it, brought it back in, and downloaded the video. From the surveillance video, he

---

[18]Only one nighttime clip was admitted into evidence, and that clip, from Friday, October 2, 2020, taken at 10:01 p.m., did not clearly show Bert's presence.

prepared 29 video clips, which were admitted into evidence without objection. Many of the clips show Mother and Bert leaving Mother's house with a baby and getting into and out of Mother's vehicle.

## E. Paternal Aunt's Testimony

Monica, Father's sister, testified that Amanda had lived with her family from June 2019 to November 2020. She described Amanda as very intelligent, articulate, and able to tell what she saw and felt. Monica related that when Amanda returned from her weekend visit with Mother in San Angelo, the two-year-old told her that Bert had gone to the park with them in the car, which was consistent with Mother's trial testimony. Monica said that she knew that Bert was not supposed to be around that weekend, and she raised her concerns about it with Hall and the guardian ad litem.

Monica reported that she had seen Mother and Father only three or four times over the course of several years because they lived "totally different"—and inherently inconsistent—lifestyles. Specifically, Monica said that Mother and Father lived a lifestyle of criminal activity and drug use and explained that "we don't live like that."

Monica had maintained a relationship with Amanda's foster parents and had seen them interact with Amanda. According to Monica, the foster parents had a good relationship with Amanda, and Amanda was very comfortable with them. Monica testified that it would be in Amanda's best interest to be adopted by the foster family because they loved her. She also felt like she would be able to maintain a relationship

with Amanda if the foster family adopted her. Monica had not seen Mother interact with Amanda.

## F. Guardian Ad Litem Report

The guardian ad litem recommended adoption by Amanda's foster parents as in Amanda's best interest.

## G. Trial Court's Ruling

At the conclusion of the trial, the trial court noted that it was a hard case and that although the court was naturally inclined to give people second chances, "children have a finite amount of time they can put up with parents and their inability to be good parents to them." The trial court expressed sympathy for the parents but explained that Amanda "should not have to give the rest of her life giving parents the opportunity to grow up and be the parents that they need to be."

## III. Sufficiency

Father challenges the legal and factual sufficiency of the evidence to support the trial court's termination of his parental rights based on its Subsection (b)(1) findings—endangerment under Subsections (D) and (E) and imprisonment under Subsection (Q). Mother challenges the factual sufficiency of the evidence to support the trial court's termination of her parental rights based on its Subsection (b)(2) finding—Amanda's best interest.

28

## A. Standards of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). We review the whole record to decide whether—as challenged here by Father—a factfinder could reasonably form a firm conviction or belief that DFPS proved either of the endangerment grounds,[19] and—as challenged here by Mother—a factfinder could reasonably form a firm conviction or belief that DFPS proved the best-interest ground. *See* Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## B. Endangerment

Under Subsection (D), DFPS had to prove that Father knowingly placed or knowingly allowed Amanda to remain in conditions or surroundings that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D).

---

[19]Subsection (M) allows a trial court to terminate the parental rights of a parent whose parent-child relationship with another child was terminated based on an endangerment finding under Subsection (D) or (E) (or an out-of-state-equivalent). Tex. Fam. Code Ann. § 161.001(b)(1)(M); *see id.* § 161.001(b)(1)(D), (E). Thus, when a parent challenges a Subsection (D) or (E) finding, due process and due course of law demand that we address the finding and detail our analysis. *In re N.G.*, 577 S.W.3d 230, 235, 237 (Tex. 2019) (per curiam); *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (per curiam); *In re Z.M.M.*, 577 S.W.3d 541, 543 (Tex. 2019) (per curiam).

Under Subsection (E), DFPS had to prove that Father engaged in conduct or knowingly placed Amanda with persons who engaged in conduct that endangered her physical or emotional well-being. *See id.* § 161.001(b)(1)(E).

The supreme court has "held that 'endanger' means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment, but that endangering conduct need not be directed at the child." *E.N.C.*, 384 S.W.3d at 803 (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The party seeking termination "bears the burden of showing how [an] offense was part of a voluntary course of conduct endangering [a child's] well-being." *Id.* at 804. "[T]he mere threat of . . . incarceration resulting from an unlawful act, regardless of severity, [does not] establish endangerment." *Id.* at 805. There must be evidence that the parent's "actions created such uncertainty and instability for his children sufficient to establish endangerment." *Id.* However, a factfinder may infer from past conduct endangering a child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.). Drug use and its effect on a parent's life and ability to parent may also establish an endangering course of conduct. *Id.* And while imprisonment alone does not constitute a continuing course of conduct that endangers a child's physical or emotional well-being, it is a fact properly considered on the issue of endangerment. *Id.*

31

Amanda was almost hit with a bullet when a police officer or bounty hunter shot at Father while attempting to apprehend him, and Father then led his pursuers on a high-speed chase with the child in the car.[20] According to Mother, Father then smoked methamphetamine in the vehicle while Mother drove him to Oklahoma to evade detention. Father's arrest (and subsequent conviction and incarceration) and Amanda's testing positive for methamphetamine immediately thereafter supported Mother's testimony about his drug use and criminal activity and showed that he had engaged in conduct that endangered Amanda's physical and emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E); *In re J.F.-G.*, No. 20-0378, 2021 WL 2021138, at *5–9 (Tex. May 21, 2021).

Amanda tested positive for methamphetamine when she was born, and in his letter that was admitted into evidence, Father showed that he knew about Mother's drug use and the tricks she used to pass drug tests. But prior to his incarceration he had nonetheless allowed Mother to care for Amanda, demonstrating that he had knowingly placed or knowingly allowed Amanda to remain in conditions or

---

[20]Father sets out the following description in his brief:

> [T]he man at the front of the car fired point blank through the car windshield, hitting [Father] in the chest and missing the child by the slightest margin. [Father] hit the gas with a white truck chasing after them, in a high speed chase through Fort Worth, flying through red lights, sliding around corners with [Amanda] still in her car seat.

*See* Tex. R. App. P. 38.1(g) (stating that in a civil case, the court will accept as true the facts stated unless another party contradicts them).

surroundings that endangered her physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). Father's sister testified that she had seen Father only three or four times over the course of several years because he lived a lifestyle of criminal activity and drug use. And she opted not to be Amanda's long-term placement because of concerns for her own safety when Father was released from prison.

Accordingly, we conclude that, under the applicable standards of review set out above, the evidence is legally and factually sufficient to support the termination of Father's parental rights because the trial court could have reasonably concluded on this record under either ground that Father had endangered Amanda's physical and emotional well-being sufficient to terminate his parental rights to her. We overrule Father's first and second points, and because either of these grounds is sufficient to support the trial court's judgment, we do not reach Father's third point. *See* Tex. R. App. P. 47.1; *see also In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (stating that along with the best-interest finding, a finding of only one ground alleged under Section 161.001(b)(1) is sufficient to support termination).

## C. Best Interest

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether

33

evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A) the [child's] desires . . . ;

(B) the [child's] emotional and physical needs[,] . . . now and in the future;

(C) the emotional and physical danger to the child now and in the future;

(D) the parental abilities of the individuals seeking custody;

(E) the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F) the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G) the stability of the home or proposed placement;

(H) the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I) any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some

34

cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Amanda, the fifth of Mother's six children, tested positive for methamphetamine at birth in 2017 and tested positive for methamphetamine again when she was removed from Mother in 2019 after Father was shot. At the time of the termination trial in 2021, she was three years old; accordingly, she did not testify during the trial, but her caseworker testified that Amanda was happy and healthy in the foster-to-adopt home with her baby sister Lara, who had also been removed from Mother. The caseworker also testified that Amanda needed permanency.

Mother had been addicted to methamphetamine for over 20 years despite undergoing numerous inpatient and outpatient courses of treatment, and the record reflected her continued exercise of bad judgment over time—her husband had introduced her to methamphetamine, and then she took up with Father, another methamphetamine user and a criminal, in a relationship that she described as involving "[a] lot of domestic violence." After Father was incarcerated, she took up with Bert, who also had a history of methamphetamine use, who had been on probation for methamphetamine possession when they met, and with whom she had used methamphetamine during the instant case. Mother acknowledged that her relationship with Father had been an "[e]xtremely bad choice," that driving Father to

35

Oklahoma instead of taking Amanda and leaving when they stopped at a gas station at the end of the high speed pursuit had been "the wrong" choice, and that asking Bert to join her in the park with Amanda on her first and only unsupervised visit was "an extremely bad choice."

The surveillance videos taken between September 30, 2020, and October 4, 2020, showed Bert's continuous presence at Mother's home in violation of the trial court's orders, but Mother testified that she did not think it was a bad choice to remain in a relationship with him even though it jeopardized Amanda and Lara's return to her. Mother maintained that every day she made plenty of good choices too and that she tried "to do the very best for [her]self and for [her] children." In his letter to their caseworker, Father expressed his concern that Mother would not stay sober if Bert was around, and he asserted that Mother had been treating her hair and urine to pass drug tests.[21] Bert denied Mother had done such things, but the trial court was tasked with judging the credibility of Mother and Bert during their testimonies.

None of Mother's children lived with her, and in addition to Amanda's testing positive for methamphetamine at birth, two of her older siblings had also tested positive. The caseworker observed that Mother had a long pattern of methamphetamine use and child neglect.

---

[21]The trial court had ordered Mother not to alter her hair between the time of a drug test request and completion of the drug test.

Mother's idea of protecting Amanda from her drug use had been to make sure that the child was in a separate room when she and Father used drugs. Mother had a home and a job with which to support Amanda, and she had "completed service plan after service plan," but the trial court could have found that completing the plan was not the same as learning from the plan and breaking a lifetime's worth of habits.

Even though Mother was bonded with Amanda and drove 400 miles round-trip for every visit, the trial court could have found that termination of Mother's parental rights was in Amanda's best interest because of the danger to Amanda's emotional and physical needs from a parent who continuously exercised flawed judgment in prioritizing her personal-relationship and lifestyle choices over her child's well-being. The trial court likewise could have found that the foster parents—who were taking care of both Amanda and Mother's new baby Lara—had better parental abilities than Mother, and that it was in Amanda's best interest to be adopted by them.

Based on our review of the entire record, and giving due deference to the trial court's findings, we hold that the trial court reasonably could have formed a firm conviction or belief that termination of Mother's parental rights to Amanda was in Amanda's best interest. *See C.H.*, 89 S.W.3d at 18–19. We overrule Mother's sole issue.

## IV. Conclusion

Having overruled all of Mother's and Father's dispositive issues, we delete the Subsection (R) finding as to Mother from the trial court's judgment and affirm the trial court's judgment as modified.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered:  July 29, 2021